IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
| --- | --- | --- |
| Plaintiff, | ) | 8:09CR99 |
| vs. | ) | REPORT AND |
| LEOPOLDO SANCHEZ, | ) | RECOMMENDATION |
| Defendant. | ) | |

This matter is before the court on the motion to suppress (Filing No. 15) filed by defendant Leopoldo Sanchez (Sanchez). Sanchez, an Indian, is charged in the Indictment with assault with a dangerous weapon within Indian country and assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 2, 113(a)(3) and (6), and 1153. **See** Filing No. 1 - Indictment. The defendant seeks to suppress statements made to law enforcement officers on January 28, 2007. **See** Filing No. 15 - Motion to Suppress. The defendant filed a brief (Filing No. 16) in support of the motion. The government filed a brief (Filing No. 18) in opposition to the motion.

On May 7, 2009, the court held an evidentiary hearing on Sanchez's motion. Sanchez was present with his appointed counsel, Assistant Federal Public Defender Shannon P. O'Connor. Assistant U.S. Attorney Douglas R. Semisch represented the United States. During the hearing, the court heard testimony from Bureau of Indian Affairs (BIA) Patrol Officer Gordon Rave (Officer Rave), Winnebago Tribe of Nebraska Police Department (WPD) Officer Daryl Monroe (Officer Monroe), and Laura Huffman (Ms. Huffman). The court also received into evidence an advice of rights form (Exhibit 1), Sanchez's school records from Winnebago Public Schools (Exhibit 2), and a page of the WPD station activity log (Exhibit 3). The court took judicial notice of Senior Judge Strom's February 20, 2009, sealed Memorandum Opinion, certifying exercise of federal jurisdiction over the case against Sanchez in this matter, pursuant to 18 U.S.C. § 5032. **See** Filing No. 25 in sealed case 8:08CR405. A transcript (TR.) of the hearing was filed on May 16, 2009, whereupon the matter was deemed submitted. **See** Filing No. 27.

## FINDINGS OF FACT

Officer Rave has been employed by the BIA as a patrol officer for 12 years (TR. 5). On January 27, 2007, Officer Rave began investigating an automobile accident that occurred within the confines of the Winnebago reservation in Nebraska (TR. 6). Officer Rave discovered the parties to the accident were the same parties involved in an assault being investigated by Officer Monroe (TR. 6-7). Officer Monroe is a police officer for the Winnebago Tribe of Nebraska and has over 22 years experience as a law enforcement officer (TR. 58). The victim of the assault, Michael Rodriguez (Rodriguez), received lacerations from his right ear, down his neck toward his left shoulder (TR. 94). The assault occurred outside a housing project on the Winnebago reservation known as the Rainbow Projects (TR. 32). The Rainbow Project's housing is located approximately 200 yards from the WPD station (TR. 32). Officers Rave and Monroe began conducting a joint investigation of both incidents (TR. 7).

On January 28, 2007, Officer Monroe interviewed witnesses relating to both the assault and the accident (TR. 7-8, 60-61). Witnesses identified Sanchez as having been involved in both incidents (TR. 61). Both officers knew Sanchez and his family personally, as the officers were friends of Sanchez's family (TR. 9, 64, 103). Additionally, Ms. Huffman, Sanchez's mother, had previously worked as a dispatcher for the WPD (TR. 64, 103). After witnesses implicated Sanchez in the assault of Rodriguez, Officers Rave and Monroe went to the residence of Fred Huffman, Sanchez's grandfather, to talk to Sanchez regarding the assault (TR. 9-10, 92).

Upon finding Sanchez at his grandfather's residence, the officers asked Sanchez to contact Ms. Huffman and have her come to his grandfather's residence (TR. 10). Although the officers were unaware Sanchez was 16 years old, they knew he was under 21 (TR. 50). Because Sanchez was under 21 at the time, the officers wanted Sanchez's mother be present during the interview (TR. 10, 64). Officers Rave and Monroe waited for Ms. Huffman to arrive and then informed her they wanted to interview Sanchez (TR. 11, 65). The officers either asked or told Ms. Huffman to bring Sanchez to the police station for questioning (TR. 93, 104).

Although the officers could have interviewed Sanchez inside the residence, they chose to interview him at the police station because they had a practice of conducting interviews at the police station (TR. 12, 66).  The officers left the Huffman residence and drove to the police station to prepare to interview Sanchez (TR. 12-13).  As part of his preparation, Officer Monroe called the Madison County Juvenile Detention Center to inquire about the availability of a room at the facility for one male (TR. 97-98, Exhibit 3).

When Ms. Huffman and Sanchez arrived at 5:55 p.m., Officer Rave escorted them to the officer squad room, located in the back of the station, for the interview (TR. 13-14, Exhibit 3).  The officer squad room is approximately 15 by 25 feet long, and contains computers for officers to type their reports (TR. 67-68). The parties were seated such that, no table, desk, or other furniture separated Sanchez from the officers (TR. 97).  At 5:58 p.m., Officer Rave read Sanchez his *Miranda* rights from a form (TR. 16-17).  Sanchez and Ms. Huffman followed along, reading from a copy of the form, as Officer Rave read the *Miranda* warning aloud (TR. 18, 111-112).  Officer Rave paused after each statement of the *Miranda* warning to ask Sanchez and Ms. Huffman if they understood the statement just read (TR. 18, 111-112).  Sanchez responded verbally to each statement, indicating he understood his rights, and additionally, he was willing to speak to law enforcement officers (TR. 19-20, 112-113).  Ms. Huffman indicated she was willing to allow the interview because she wanted to find out, for her son's sake, what had happened (TR. 20, 113).  Sanchez, Ms. Huffman, and both officers signed the advice of rights form containing the *Miranda* warning (TR. 20-21).

Officers Rave and Monroe testified they maintained a calm demeanor throughout the interview, that they remained in chairs, and at no point did they raise their voices, get in Sanchez's face, or threaten to charge him with any crime other than assault, but they did want to "get the matter resolved" (TR. 22-23, 74).  Ms. Huffman testified, however, the officers were angry and intimidating during the interrogation, they got in Sanchez's face, they badgered him and yelled at him, they told him he was going to jail, and they threatened to charge him with attempted murder and assault with a deadly weapon (TR. 105-107).  At no time did either Ms. Huffman or Sanchez request the presence of an attorney or to stop the interview (TR. 20, 113).

Initially, Sanchez did not appear to be intimidated by the officers, but he made little eye contact with the officers when answering questions, denied any involvement in the assault, and made contradictory statements (TR. 24-25, 73-74). Sanchez's demeanor was quiet and he appeared anxious (TR. 75). Throughout the interview, Ms. Huffman repeatedly told Sanchez to "tell the truth" (TR. 49, 75). As the interview progressed, Ms. Huffman appeared upset and shocked to find out her son may have been involved in an assault (TR. 75, 77). Ms. Huffman also became visibly angry with Sanchez and began yelling at, questioning, and pressing Sanchez (TR. 50, 80, 107).

Officer Monroe testified that, at one point during the interview, Ms. Huffman wanted to know what kind of injuries the assault victim received (TR. 77). Ms. Huffman testified she did not make any such request (TR. 113). Either way, however, Officer Monroe produced a graphic photograph of the victim's injuries and showed the photograph to Ms. Huffman (TR. 25, 94). Officers Rave and Monroe were aware that Sanchez saw the photograph when they showed it to Ms. Huffman (TR. 26). Ms. Huffman became very upset after seeing the photograph of the victim's injuries, and began crying (TR. 77). Sanchez put his head down and also became upset after seeing the photograph and seeing his mother crying (TR. 26, 77-78). Officer Monroe testified that showing the photograph to Ms. Huffman and Sanchez was not a tactic for coercing a confession from Sanchez (TR. 78).

Officer Rave expressed concerns to Sanchez and Ms. Huffman regarding possible retaliation by Rodriguez's family (TR. 26-27). Officer Rave testified he was concerned about the safety of Sanchez's little sisters (TR. 27). Rodriguez's brother has a reputation in the Winnebago community as a trouble-maker, and has been known to carry shotguns and to "take care of his brothers" (TR. 26-27, 78). The officers testified that expressing their concern over retaliation was not a tactic for coercing a confession from Sanchez (TR. 27, 78).

After the officers had shown the photograph and expressed concerns over retaliation, Ms. Huffman looked at Sanchez and again told him to "tell the truth" (TR. 27). At that point, Sanchez said, "I did it" (TR. 27). At 6:24 p.m., upon hearing Sanchez's statement, Ms. Huffman, upset and crying, exited the room, left the police station, and

drove home (TR. 28, 79, 81, 115-116, Exhibit 3). Officer Monroe also left the room and made a phone call to arrange for Sanchez to be transported to the Madison County Juvenile Detention Center (TR. 30, 80-81). Officer Rave put handcuffs on Sanchez to place him under arrest (TR 29-30). The interview lasted 26 minutes (TR. 41, 86-88, Exhibit 3).

After placing Sanchez in handcuffs, Officer Rave continued questioning Sanchez regarding his involvement in the assault (TR. 31). Sanchez admitted to being at the Rainbow Projects at the time of the assault, to using a 2-inch folding knife to assault Rodriguez, and to throwing the knife after using it (TR. 31-32, 82). Sanchez, who was now more relaxed and cooperative, told Officer Rave he would go to the Rainbow Projects to show the officers where the assault took place, and where he threw the knife (TR. 32-33, 82). When Officer Monroe returned to the interview room a few minutes later, Officer Rave informed Officer Monroe of Sanchez's additional statements and of Sanchez's willingness to go to the Rainbow Projects with the officers (TR. 33-34).

Some conflict exists between the testimony offered with respect to the events following Officer Monroe's return to the interview room. Officer Rave testified Ms. Huffman returned to the interview room, she was present when Officer Rave told Officer Monroe of Sanchez's additional statements, and Ms. Huffman was aware the officers intended to take Sanchez to the Rainbow Projects (TR. 33-35). Officer Monroe, however, testified Ms. Huffman did not return to the interview room, and in fact, the officer did not know where Ms. Huffman had gone (TR. 83). Ms. Huffman testified that after leaving the interview room, she left the police station and went home, but returned shortly thereafter and learned the officers had left the station with Sanchez (TR. 115-116). Ms. Huffman was unaware the officers intended to take Sanchez to the Rainbow Projects for further questioning, and she waited at the police station until the officers returned with Sanchez (TR. 116-117). The police station activity log indicates Ms. Huffman left the police station at 6:24 p.m., and Officer Rave left with Sanchez at 6:39 p.m. (Exhibit 3).

At 6:39 p.m., fifteen minutes after the police station activity log indicates Ms. Huffman left the station, Officer Rave placed Sanchez in the back of his police cruiser and drove to the Rainbow Projects (TR. 34, Exhibit 3). Officer Monroe drove to the Rainbow

5

Projects in a separate vehicle (TR. 35, 83). Sanchez indicated to the officers where the assault took place, how it happened, and where he threw the knife (TR. 35-36, 83-84). Sanchez also told officers the names of other individuals involved in the assault on Rodriguez (TR. 84). The police officers and Sanchez were at the Rainbow Projects for approximately 15 minutes (TR. 37-38). Officer Rave did not attempt to interview Sanchez while transporting him to or from the Rainbow Projects (TR. 43). After returning to the police station, Sanchez was transported by Officer Eric Crazy Bear to the Madison County Juvenile Detention Center at 8:01 p.m. (TR. 42, Exhibit 3).

**LEGAL ANALYSIS**

Sanchez argues all statements made by him to law enforcement officers on January 28, 2009, should be suppressed because the statements were not voluntary and law enforcement officers violated Sanchez's Fifth Amendment rights. **See** Filing No. 15. Sanchez asserts officers overbore his will during police interrogation, resulting in an involuntary statement by Sanchez. The government argues statements made by Sanchez should not be suppressed because the statements were voluntary and police officers took no action to overbear Sanchez's will. **See** Filing No. 18.

**A.** *Miranda* **Warning**

The Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." United States v. Patane, 542 U.S. 630, 637 (2004). The Fifth Amendment applies to juveniles as well as to adults. **See** In re Gault, 387 U.S 1, 49-50 (1967). The touchstone for the admissibility of a defendant's statements is voluntariness. Brown v. Mississippi, 297 U.S. 278 (1936). "*Miranda* rested on insight into the inherently coercive character of custodial interrogation and the inherently difficult exercise of assessing the voluntariness of any confession resulting from it." Patane, 542 U.S at 645. Accordingly, "[t]he requirements of *Miranda* arise only when

a defendant is both in custody and being interrogated." *United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005).

> Not every confession obtained absent the *Miranda* warnings is inadmissible, however, because "police officers are not required to administer *Miranda* warnings to everyone whom they question. . . . *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (**quoting** *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation and citation omitted); **see** *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009). Furthermore, "a consensual encounter does not amount to a custodial situation requiring the administration of *Miranda* warnings." *United States v. Woods*, 213 F.3d 1021, 1023 (8th Cir. 2000).

The officers desired Ms. Huffman be present during the interview, and Ms. Huffman drove Sanchez to the police station for questioning. Prior to the interview, neither Officer Rave nor Officer Monroe deprived Sanchez of his freedom of action in any significant way. The officers allowed Sanchez to come to the police station on his own. Because the officers had not taken Sanchez into custody prior to the interview, the officers were not required to advise Sanchez of his *Miranda* rights. Before questioning Sanchez, however, the officers read Sanchez the *Miranda* warning and asked Sanchez and Ms. Huffman whether they understood those rights. Sanchez and Ms. Huffman both indicated they understood the *Miranda* rights, and signed an advice of rights form (Exhibit 1).

Although Sanchez was taken in to custody after 26 minutes of interrogation, Sanchez had been advised of his *Miranda* rights before officers began questioning him. Sanchez does not challenge the *Miranda* warnings, and the court finds no fault with Sanchez's advice of rights.

**B.      Voluntariness of Statements**

Even though Sanchez was advised of and understood his *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether Sanchez made statements to the officers voluntarily. An involuntary confession is inadmissible in court. **See** *Blackburn v. Alabama.*, 361 U.S. 199, 210 (1960) ("Where the involuntariness of a confession is conclusively demonstrated, . . . the defendant is deprived of due process by entry of judgment of conviction without exclusion of the confession."). "To determine whether a waiver or a confession was voluntary, a court looks at the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Castro-Higuero*, 473 F.3d 880, 886 (8th Cir. 2007); **see** *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008). "The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Astello*, 241 F.3d 965, 967 (8th Cir. 2001) (*quoting* *United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir. 1995)). Likewise, in considering whether an individual's will was overborne, "a court must examine both 'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002) (*quoting* *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992)). The Supreme Court indicated important factors to consider regarding whether a confession was voluntary under the totality of the circumstances include the defendant's maturity, education, and mental health. **See** *Withrow v. Williams*, 507 U.S. 680, 693 (1993).

The facts of this case indicate under a totality of the circumstances, Officers Rave and Monroe overbore Sanchez's will during interrogation, such that Sanchez's confession was involuntary. The court begins by considering Sanchez's capacity to resist pressure to confess. In terms of education, Sanchez has met the requirements for graduation from the Winnebago Public High School, and is of average intelligence in most respects. The court has reviewed and considered Senior Judge Strom's findings regarding Sanchez's age, social background, extent and nature of prior delinquency, his present intellectual development and psychological maturity, and the nature of past treatment and response

8

to such treatment. **See** Filing No. 25 in 8:08CR405 (sealed). Although there exists no evidence to suggest Sanchez is not mentally well, the record in this case indicates Sanchez appears to be rather immature and easily influenced by others. **See** *id.* At the beginning of the interview, Sanchez demonstrated a capacity to resist pressure to confess when he denied having assaulted the victim. However, if a person's will is not overborne at the outset of a police interrogation, it does not necessarily follow that his will cannot become overborne later in the same interrogation. **See** *Haley v. Ohio*, 332 U.S. 596, 599-600 (1948) (indicating 15 year old's will overborne after five hours of interrogation); *Taylor v. Maddox*, 366 F.3d 992, 1015-16 (9th Cir. 2004) (stating 16 year old boy's will overborne after three hours of interrogation). The court finds under the circumstances, Sanchez had a below-average ability to resist pressure to confess during the interrogation. **See** *United States v. Morris*, 491 F. Supp. 226, 229 (D. Ga. 1980) (confession inadmissible where twenty-two year old defendant was immature, yet not unintelligent).

The court now considers the conduct of law enforcement officials during the interrogation. The legal analysis in this case is only partially dependent on a credibility determination, to the extent a credibility determination is needed the court finds Ms. Huffman to be the more credible than the officers on two specific issues. This determination is made based upon each of the witnesses' demeanor during the hearing, intelligence, memory, motives, general reasonableness and consistency with other testimony. The other evidence in this case more closely corroborates Ms. Huffman's testimony. Specifically, Ms. Huffman's testimony appears more accurate and reasonably likely regarding the events following Sanchez's statements, and regarding the demeanor of the officers during the interview.

Ms. Huffman testified she did not return to the interview room following Sanchez's statements, but she went home, and returned shortly thereafter. Ms. Huffman also testified she was unaware the officers intended to take Sanchez to the Rainbow Projects, and upon returning to the police station she was informed the officers had taken him. The station activity log corroborates Ms. Huffman's testimony and although the station activity log does not document Ms. Huffman's return to the police station, it clearly indicates she left the

station a second time at 8:01 p.m., the same time Officer Eric Crazy Bear transported Sanchez to the Madison County Juvenile Detention Center.

The court discounts the officers' testimony that they remained seated during the interview and never raised their voices. Given that Sanchez continually denied any involvement in the assault when the officers had witness statements implicating Sanchez, Sanchez's answers to questions were contradictory, Ms. Huffman repeatedly told Sanchez to tell the truth, and officers wanted to "get the matter resolved," it would be reasonable to assume the interview was emotionally charged and police officers would have raised their voices under such circumstances. Accordingly, the court finds Ms. Huffman's testimony regarding officers' demeanor during the interview to be credible.

In determining whether the officers' conduct overbore Sanchez's will, the court will examine the officers' conduct and Ms. Huffman's conduct. As an initial matter, the officers' interrogation of Sanchez could have taken place at Sanchez's home, but the officers chose to conduct the interrogation at the police station. The facts of this case indicate the officers were angry and intimidating, they got close to Sanchez's face, and they were yelling at and badgering Sanchez. Officers told Sanchez he was "going to jail," and threatened him with charges of attempted murder and assault with a deadly weapon. Additionally, the officers' suggestion of possible retaliation by the victim's brother, who was known to be dangerous, may reasonably be considered a threat to a person in Sanchez's position. Such a threat of possible violent retaliation may be considered particularly coercive in light of the fact Officer Rave knew Sanchez had younger sisters. Finally, allowing Sanchez to see a photograph of the victim's injuries may have been a significant factor in overbearing the will of Sanchez, given his level of immaturity, low tolerance for resisting others' influence, and seeing his mother emotionally upset after viewing the graphic photograph of Rodriguez' injuries.

In addition to the interrogation, Ms. Huffman also posed questions and made statements to Sanchez during the officers' questioning. Accordingly, the court must now consider whether Ms. Huffman was used by law enforcement officials to coerce a confession from Sanchez. "[T]wo critical factors in the 'instrument or agent' analysis are: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2)

whether the party performing the search intended to assist law enforcement efforts to further his own ends." *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982). In this case, it is clear the officers knew Ms. Huffman was questioning Sanchez regarding the assault at the same time as the officers. The officers were in the interview room with Ms. Huffman as she spoke to Sanchez, and the officers made no attempt to prevent or deter Ms. Huffman from communicating with Sanchez. However, Ms. Huffman's testimony indicates she did not act with the intent to assist law enforcement efforts, but to further her own ends as a concerned mother. A parent who acts to further her own ends, in a private capacity, does not act in an official capacity to implicate the Fourth Amendment. **See *Oregon v. Pearson*, 514 P.2d 884, 886 (Or. Ct. App. 1973)** ("[O]fficial involvement is not measured by the primary occupation of the actor, but by the capacity in which he acts at the time in question."); **see also *J.M.A. v. Alaska*, 542 P.2d 170, 174-75 (Alaska 1975)** (finding no state action where foster parent searched bedroom of foster child); ***California v. Wolder*, 84 Cal. Rptr. 788, 793-94 (Cal. Ct. App. 1970)** (concluding no state action where police officer, acting as concerned parent, searched daughter's apartment). In considering these two factors, the court recommends Ms. Huffman did not act as an agent or instrument of the government in questioning Sanchez. Furthermore, parental pressure does not render a confession involuntary. ***United States v. Erving L.*, 147 F.3d 1240, 1251 (10th Cir. 1998)** (**citing *N. Mariana Islands v. Doe*, No. 87-1108, 1998 WL 31904, at \*4 (N. Mar. I. Mar. 31, 1988)** (unpublished disposition) (determining responses to police questions coerced by a parent are not involuntary)). In any event, to apply the exclusionary rule in such case would not serve the purposes of the rule, i.e., to deter law enforcement officers from engaging in unconstitutional conduct.

Although Ms. Huffman's conduct does not constitute state action, the facts of this case are sufficient to support a finding that Sanchez's will was overborne prior to his confession. Furthermore, even though the officers testified their actions were not intended to be coercive, when considering the totality of the circumstances, the facts support a finding that the officers' conduct had a cumulative effect of overbearing Sanchez's will. The court concludes Sanchez's will was overborne during police interrogation prior to confessing to Officers Rave and Monroe about his involvement in the assault of Rodriguez.

Because the officers overbore Sanchez's will, Sanchez's confession should be found involuntary, and therefore, inadmissible. Inasmuch as Sanchez's confession was involuntary, statements made subsequent to his confession, including those made to Officer Rave after Ms. Huffman left the interrogation room and those made at the scene of the assault, should be suppressed as the fruit of the poisonous tree pursuant to *Wong Sun v. United States*, 371 U.S. 471 (1963). Upon consideration,

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Leopoldo Sanchez's Motion to Suppress (Filing No. 15) be granted.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 25th day of June, 2009.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge